# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Douglas N. Barber,                                    File No. 11-cv-1221 (JRT/TNL)

      Plaintiff,

v.                                                    **REPORT &**
                                                      **RECOMMENDATION**
Michael J. Astrue,
Commissioner of the Social Security
Administration,

      Defendant.

---

Neut L. Strandemo, Strandemo Sheridan & Dulas, PA, 1380 Corporate Center Curve, Suite 320, Eagan, MN 55121 (for Plaintiff); and

David W. Fuller, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Defendant).

---

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on cross-motions for summary judgment: Plaintiff's Motion for Summary Judgment (Docket No. 9) and Defendant Commissioner's Motion for Summary Judgment (Docket No. 17). These motions have been referred to the undersigned magistrate judge for a report and recommendation to the district court under 28 U.S.C. § 636 and Local Rule 72.2(b).

Based upon the record and memoranda, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Docket No. 9) be **GRANTED IN PART** and this matter **REMANDED** for further consideration and Defendant Commissioner's Motion for Summary Judgment (Docket No. 17) be **DENIED**.

1

## I.      Introduction & Procedural History

Plaintiff applied for disability insurance benefits ("DIB") on July 19, 2007, stating that he had been unable to work since August 15, 2003, due to back pain, hip pain, major depressive disorder, chemical dependency, and Hepatitis C. (*See* Tr. at 17; *see also* Tr. at 230-34; *accord* Tr. at 320-22.)  Plaintiff's application was initially denied on November 14, 2007, and again upon reconsideration on June 12, 2008. (Tr. at 15; *see also* Tr. at 33.)  Plaintiff subsequently appealed the reconsideration determination by requesting a hearing before an administrative law judge ("ALJ"). (Tr. at 15.)  On December 17, 2009, a hearing was held before the ALJ.  (Tr. at 29, 31.)   On February 19, 2010, the ALJ concluded that Plaintiff has not been under a disability since August 15, 2003.  (Tr. at 12-14; *accord* Tr. at 15, 25.)

Plaintiff requested review of the ALJ's decision.  (*See* Tr. at 8, 10-11.)  On March 25, 2011, the Appeals Council denied Plaintiff's request for review.   (Tr. at 1-3.) Plaintiff brought the present action on May 10, 2011. (Docket No. 1, Pl.'s Mem. in Supp. of Summ. J. at 2.)  Plaintiff moved for summary judgment on October 3, 2011. (Docket No. 9.)   The Commissioner moved for summary judgment on December 23, 2011. (Docket No. 17.)

## II.      Facts

### A. Background

Plaintiff is a divorced, fifty-six-year-old male.  (*See* Tr. at 38, 230.)  Plaintiff alleges an onset of disability on August 15, 2003. (Tr. at 124.)  Plaintiff has been living at the Minnesota Veterans Home ("Veterans Home") in Hastings, Minnesota, since

January 2004. (Tr. at 36.) Plaintiff describes his daily activities at the Veterans Home as: "I wake up at 6:30 – 9:00, eat breakfast, attend any medical appointments, participate in activities of interest, eat dinner, and go to bed between 10:00 – 11:00." (Tr. at 182.) Plaintiff's cooking, grocery shopping, and cleaning are taken care of by Veterans Home staff. (Tr. at 36; *see also* Tr. at 321.)

Plaintiff alleges disability resulting from back pain, leg pain, major depressive disorder, liver disease, Hepatitis C, cannabis dependency, and alcohol dependency. (*See* Tr. at 17; *see also* Tr. at 230-34; *accord* Tr. at 320-22.) Plaintiff's chemical dependency issues arose early in his life, but Plaintiff did maintain 16 years of sobriety during his marriage, which ended in 1999. (Tr. at 282.)

During 2003, Plaintiff's depression and chemical dependence issues precluded full-time employment; Plaintiff, however, has been employed as a part-time cashier at the Veterans Home's canteen since February of 2004. (Tr. at 282; *see* Tr. at 274, 276-77; *see also* Tr. at 265.) Plaintiff's most recent full-time employment was in 2003 as a car salesman. (Tr. at 153; *see also* Tr. at 171.) Plaintiff has also been employed as a delivery driver, insurance salesman, and construction worker. (Tr. 153; *see also* Tr. at 40-42, 479; *accord* Tr. at 222.)

### B. Relevant Medical History

#### 1. Prior to 2003

Plaintiff's back pain originated with an injury sustained in 1978 while he was working for a construction company. (T. at 473; *see* Tr. at 289, 482.) Plaintiff reported lower back pain after "lifting very heavy posts" weighing about 200 to 300 pounds. (Tr.

3

at 482.)  He saw a physician who recommended bed rest and abstention from work and heavy lifting, but Plaintiff's condition did not improve.  (Tr. at 482.)  At the beginning of September, Plaintiff reported extreme pain and numbness in his left leg and was treated with Butazoldin Alka[1] and confined to bed rest.[2]  (Tr. at 482.)  Plaintiff was admitted to Rice Memorial Hospital on September 22, 1978, and treated with bed rest and pelvic traction, but no improvement was noted.  (Tr. at 482.)  On September 26, 1978, Plaintiff saw R.L. Holmgren, M.D., at the hospital.  (Tr. at 482.)  Dr. Holmgren reported that a myelogram[3] confirmed an extradural defect at the L4-5 vertebrae and Plaintiff's symptoms were found to be consistent with a "herniated nucleus pulposus"[4] at the L4-5 level, impinging on the L5 nerve root into his lower left leg.  (Tr. at 482.)  Dr. Holmgren recommended a laminectomy[5] and diskectomy[6].  (Tr. at 482.)  Plaintiff subsequently underwent a laminectomy and diskectomy performed by Ray Struck, M.D.  (See, e.g., Tr. at 477, 289; accord Tr. at 320.)

Plaintiff saw J.P. Zachman, M.D., on October 18, 1982 at Rice Memorial Hospital. (Tr. at 481.)  Dr. Zachman's examination showed central bulging discs at L3-4 and L5-S1

---

[1] Butazolidin Alka, or Phenylbutazone is an anti-inflammatory drug that is no longer approved for use in humans due to some severe toxic reactions. *Phenylbutazone*, Nat'l Library of Medicine Hazardous Substances Database, http://toxnet.nlm.nih.gov/cgi-bin/sis/search/r?dbs+hsdb:@term+@rn+50-33-9 (last visited July 12, 2012).

[2] The available record only incorporates this information by reference.

[3] A myelogram is a form of spine imaging used alone or in conjunction with a CT scan "to get a better image of the nerve roots and pick up smaller injuries." *Lumbar Spine CT Scan*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004600/ (last visited August 2, 2012).

[4] Also known as a herniated disc, a herniated nucleus pulposus "occurs when all or part of a disk in the spine is forced through a weakened part of the disk. This may place pressure on nearby nerves." *Herniated Disk*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001478/ (last visited July 12, 2012).

[5] "Laminectomy is surgery to remove the lamina, part of the bone that makes up a vertebra" *Laminectomy*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004636/ (last visited July 12, 2012).

[6] "Diskectomy is surgery to remove all or part of a cushion that helps protect your spinal column." *Diskectomy*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004511/ (last visited July 12, 2012).

and an "apparent small central herniated disc extending slightly above the disc space at the L4-5 level." (Tr. at 481.)  No other abnormalities were noted. (Tr. at 481.)  It is not clear from the record what, if any, treatment was recommended.

In January 1985, Plaintiff underwent a CT scan of his lumbar spine[7] after reporting low back and left leg pain.  (Tr. at 480.)  The scan showed evidence of "mild postoperative perinueral fibrosis involving the left L5 nerve root, but no evidence of recurrent disc herniation." (Tr. at 480.)  The report additionally noted that there was

> no evidence of recurrent or residual disc herniation. There is mild concentric bulging of the disc annulus. There is no displacement nor impingement on either of the L5 nerve roots. . . . There is very slight enlargement of the nerve roots within the thecal sac and proximal aspect of the of the left L5 nerve root sheaths which is consistent with either residual edema or intraneural fibrosis.  There is mild central bulging of the disc annulus at the L5-S1 but no evidence of disc herniation nor S1 nerve root impingement.  The L3-4 level is unremarkable.

(Tr. at 480.)

Several years later, in June 1993, Plaintiff saw Dr. Holmgren again and was given local injections of Depo-Medrol[8] and Carbocaine[9] for inflammation. (Tr. at 479.)  Dr. Holmgren recommended ice for spasms and pain, low-heat, and rest over the weekend. (Tr. at 479.)

---

[7] "A computed tomography (CT) scan of the lumbar spine is an imaging method that uses x-rays to create cross-sectional pictures of the lower back" *Lumbar Spine CT Scan*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004600/ (last visited July 12, 2012).

[8] Depo-Medrol is a brand name for the drug methylprednisolone acetate, an injectable anti-inflammatory drug. *Depo-Medrol Prescribing Information*, U.S. Food & Drug Admin., http://www.accessdata.fda.gov/drugsatfda_docs/label/2009/011757s085s086lbl.pdf (last visited July 12, 2012).

[9] Carbocaine is a brand name for the drug mepivacaine, a local anesthetic used for "infiltration, nerve block, and epidural anesthesia." *Mepivacaine*, Pub Chem, Nat'l Center for Biotechnology Info., http://pubchem.ncbi.nlm.nih.gov/summary/summary.cgi?cid=4062 (last visited July 12, 2012).

In July 1993, Plaintiff started a new job delivering and unloading snacks. (Tr. at 479.) Plaintiff returned to Dr. Holmgren on December 14, 1993. (Tr. at 479.) Plaintiff reported increasing, continuous, left, low-back pain at the incision site from his laminectomy to the point of being unable to work. (Tr. at 479.) At this time, he was not doing any exercises or taking any medications. (Tr. at 479.) Dr. Holmgren noted positive straight-leg raise at 10-15 degrees on the left and 15-20 degrees on the right.[10] (Tr. at 479.) Plaintiff's deep tendon reflexes were 2-3+ at both Achilles and patellar in the lower extremities. (Tr. at 479.) Dr. Holmgren did not note any weakness. Forward bending of 30-40 degrees caused Plaintiff pain on the left side. (Tr. at 479.) There was a visible muscular soft-tissue mass arising from the lower aspect of the lumbar scar and this area was "somewhat tender." (Tr. at 479.) Dr. Holmgren concluded that Plaintiff suffered from "[m]echanical low back pain with sciatica to the left" and "[p]robable underlying degenerative back disease." (Tr. at 479.) Dr. Holmgren prescribed Motrin for pain and a course of treatment, including:

> Patient will be taken off of his current job which requires lifting and prolonged sitting and driving a vehicle. He will be re-examined in one week. He will be seeing a therapist to have some treatment for his low back injury along with some talk about the use of both exercises and support for his back while driving. An MRI scan will be obtained to rule [out] . . . the possibility of recurrent disc [herniation]. . . .

(Tr. at 479.)

---

[10] "Leg pain that occurs when you sit down on an exam table and lift your leg straight up usually suggests a slipped disk in your lower back." *Herniated Disk*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001478/ (last visited July 20, 2012).

On March 28, 1994, Plaintiff saw Mark Engasser, M.D., for a second opinion on his low-back injuries. (Tr. at 477.) Plaintiff told Dr. Engasser that Dr. Holmgren recommended an MRI and physical therapy, but the worker's compensation carrier refused to pay for the MRI. (Tr. at 477.) At that time, Plaintiff had been off work since December 3, 1993. (Tr. at 477.) Plaintiff told Dr. Engasser that he post-operatively reinjured his back in April 1979 after returning to work. (Tr. at 477.) After the re-injury, Plaintiff returned to light-duty work but had ongoing problems with his back and left leg, describing a "knot" in his back. (Tr. at 477.) Plaintiff described left-buttock and posterior-thigh pain that was "more constant" than pain he had experienced previously. (Tr. at 477.) Plaintiff also described "ongoing mechanical back pain, with an element of pain at all times." (Tr. at 477.) Dr. Engasser noted that Plaintiff was able to get off of the examining table "slowly." (Tr. at 477.) He additionally noted:

> There is mild flattening of the lumbar spine. He exhibits a well-healed lumbar scar which is mildly tender to palpation. He exhibits lumbar paravertebral discomfort. There is no cervical or thoracic spinous process tenderness or paravertebral discomfort. Active range of motion of the lumbar spine is reduced. . . . Side bending to the right, he does exhibit left buttock and posterior thigh pain. There is no sciatic notch tenderness, although there is mild sacroiliac discomfort on the left. The patient is able to heel and toe walk without evidence of motor weakness. . . . The pain extends down the posterior thigh and past the calf. . . . He exhibits full range of motion of both hips, knees, and ankles. . . . Resistive motor strength of in the lower extremities is within normal limits.

(Tr. at 477-78.)

7

Dr. Engasser diagnosed Plaintiff with a post-diskectomy lumbar disc herniation and a possible recurrent herniation, and recommended an MRI of the lumbar spine to rule out recurrent nerve impingement. (Tr. at 478.) He also recommended a "conservative program of treatment" for Plaintiff's lumbar pain, including Medrol injections[11] and physical therapy. (Tr. at 478.)

Plaintiff underwent an MRI of his lumbar spine later on March 30, performed by A.H. Ruhe, M.D. (Tr. at 476.) The diagnostic impression was "no evidence of recent fracture or dislocation of the lumbar spine." (Tr. at 476.) Additionally, Plaintiff's intervertebral disc spaces, sacroiliac joints, and articular facets appeared within normal limits. (Tr. at 476.) Dr. Ruhe noted the MRI showed no abnormalities of the vertebral bodies, but did indicate a small, central herniated disc at L5-S1 and a defect from the 1978 laminectomy at L4-L5 on the left. (Tr. at 476.) Plaintiff's spinal canal, spinal cord, and paraspinal soft tissue were normal. (Tr. at 476.)

Plaintiff filed an employee's claim petition with the State of Minnesota Worker's Compensation Division for "Minute Trauma" lasting from June 8 through December 3, 1993. (Tr. at 473.) Plaintiff indicated that the injury to his back and legs arose out of and in the course of his employment with the construction and snack companies. (Tr. at 473, 477.) Plaintiff listed a "temporary total disability" beginning December 4, 1993 and "continuing." (Tr. at 473.) Plaintiff requested that rehabilitation benefits be reinstated. (Tr. at 473.) It is not clear from the record whether those benefits were ever reinstated.

---

[11] Medrol is a brand name for methylprednisolone acetate, an anti-inflammatory drug. *Methylprednisolone Oral*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000776/ (last visited July 20, 2012).

## 2. 2004 - 2005

Plaintiff was admitted to the Veterans Home in January 2004 and underwent an

admission physical with Denise Buss, R.N., C.N.P. (Tr. at 230.)  Plaintiff reported

> chronic back pain since his surgery. He describes it as a dull,
> constant pain and he is usually able to tune it out. At times he
> does have flare-ups where he will get spasm in his back and
> his leg. He has used Flexeril[12] in the past with good relief
> when these exacerbations occur. He describes the pain as
> starting in his back and shoots down into his buttocks and
> down into his knee. For pain relief he uses Ibuprofen [sic] and
> Tylenol as needed, as well as Flexeril and he does exercises
> for his back.

(Tr. at 232.)  Other than chronic back pain, Plaintiff denied any other joint pain, stiffness,

swelling, or edema.  (Tr. at 232.)  Plaintiff also denied trouble with coordination,

weakness, numbness, or tingling.  (Tr. at 232.)  Buss did note that Plaintiff indicated a

loss of sensation on the outside of his right thigh, lateral calf, and right foot from nerve

damage in his leg.  (Tr. at 232.)  Plaintiff was "seen by Neurology and had an EMG done,

which showed damage to a nerve in his leg.  He was fitted with a brace for his foot and

he was told to wear it for three months and follow-up with them if there was no

improvement."[13]  (Tr. at 232.)  Buss noted that Plaintiff had "good functional range of

movement, except in his right ankle" and that his spine was "non-tender with palpation."

(Tr. at 234.)

---

[12] "Cyclobenzaprine, a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries." *Cyclobenzaprine*, PubMed Health, Nat'l Center for Biotechnology, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000699/ (last visited July 19, 2012). Cyclobenzaprine is sold under the brand name Flexeril. *Id.*

[13] It is not clear from the record when Plaintiff was seen by a neurologist and fitted with the foot brace.

Plaintiff told Buss that his intravenous drug, cannabis, and alcohol use began at the age of 18, ceased during the 16 years of his marriage, and then began again in 2003 after his brother passed away. (Tr. at 230-31.) Plaintiff estimated his cannabis use at 2-3 times per week initially, then more frequently prior to checking himself into a St. Cloud treatment facility in September of 2003. (Tr. at 231.) At the time he checked himself into treatment, Plaintiff was also using cocaine, methamphetamines, and drinking alcohol. (Tr. at 231.) Plaintiff indicated to Buss that he walked for exercise and enjoyed fishing and racing cars and snowmobiles. (Tr. at 231.) Plaintiff told Buss that he believed his history of depression "is due to the loss of his brother and he is taking medicine currently for this, but he feels it will be temporary." (Tr. at 232.)

After the physical examination, Buss diagnosed Plaintiff with: dysthymia[14], major depressive disorder, Hepatitis C, cannabis dependence, methamphetamine dependence, alcohol abuse, cocaine abuse, nicotine dependence, and probable perineural nerve damage. (Tr. at 234.) Buss also noted that Plaintiff was overweight. (Tr. at 234.) Buss placed Plaintiff on citalopram[15] and recommended an increase in activity and wearing his foot brace as instructed. (Tr. at 234.) Plaintiff received no activity restrictions, and his "discharge potential" was listed as "[g]ood." (Tr. at 235.) Plaintiff received a doctor's permission to use the fitness room on January 29. (Tr. at 272.)

---

[14] "Dysthymia is a chronic type of depression in which a person's moods are regularly low. However, symptoms are not as severe as with major depression." *Dysthymia*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001916/ (last visited July 20, 2012).

[15] "Citalopram is used to treat depression. . . . It is thought to work by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance." *Citalopram*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001041/ (last visited July 19, 2012). Citalopram is sold under the brand name Celexa. *Id.*

Plaintiff also participated in a Pain Assessment with E. Mattson, L.P.N., indicating a history of chronic, continuous pain in his lower back, which extended to the outside of his left leg and foot. (Tr. at 293.)  On a scale from 1-10, Plaintiff rated his pain as "7" and reported tingling and lack of feeling on the outside and tops of his feet. (Tr. at 293.) He indicated that exercise relieved the pain and cold exacerbated it. (Tr. at 294.)  He felt that a pain level of 7 out of 10 was acceptable. (Tr. at 294.)  At the time, Plaintiff was prescribed Flexeril on an as-needed basis for muscle spasms. (Tr. at 295.)  On January 23, Mattson observed that Plaintiff was "doing well, getting to know the facility and his peers." (Tr. at 271.)

On January 22, 2004, Plaintiff was seen by David Horsbch, B.A.  (Tr. at 278-79.) Horsbch noted that Plaintiff suffered from alcohol dependence, methamphetamine dependence, dysthymia, depressive disorder, cannabis dependence, and cocaine abuse. (Tr. at 278.)  He noted that Plaintiff's symptoms were managed with medication and coping skills; Plaintiff was compliant with physician orders; and Plaintiff had sessions with mental health staff "as needed." (Tr. at 278-79.)

On January 29, in a diet consultation with the Veterans Home's dining hall coordinator, L. Endres, Plaintiff stated that he "walks a lot and tr[ies] to play basketball" and that his appetite was "good." (Tr. at 272.)

Plaintiff began work as a part-time cashier in the canteen in February 2004.  (*See* Tr. at 320.)  At the beginning of this employment, Plaintiff was precluded from lifting "heavy weights." (Tr. at 253.)  Michael Kriel assessed Plaintiff's performance as a canteen worker quarterly between April 2004 and April 2007. (Tr. at 273-74, 276-77.)

11

Kriel's assessments of Plaintiff's performance are universally positive and note his accuracy, dependability, good attitude, and the ability to get along well with customers and coworkers. (Tr. at 276-77.)

On April 2, 2004, Plaintiff was seen by Sonya Thompson, R.T., who noted that Plaintiff should be encouraged to use the fitness room. (Tr. at 273.)

Between October 2004 and October 2006, Plaintiff met with Renae J. Hill, C.R.T., six times to discuss his participation in recreational and social involvement activities at the Veterans Home. (Tr. at 274-75.) Hill noted that Plaintiff participated in 1-3 recreation programs per week in October 2004; 1-4 programs per week in April 2005; 2-3 programs per week in October 2005; 2-5 programs per week in April 2006; and 1-3 programs per week in October 2006. (Tr. at 274-75.) These programs included bingo, hobby shop, dining out, outings, socials, and movies. (Tr. at 274-75.)

During 2004 and 2005, Plaintiff was temporarily placed on several pain medications, including Darvocet[16], Vioxx[17], ibuprofen[18], and acetaminophen[19]. (*See* Tr.

---

[16] Darvocet is a brand name for acetaminophen and propoxyphene, a "combination of drugs is used to relieve mild to moderate pain." *Acetaminophen and Propoxyphene*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000015/ (last visited July 20, 2012).

[17] "The anti-inflammatory drug rofecoxib (Vioxx) was withdrawn from the market at the end of September 2004 after it was shown that long-term use (greater than 18 months) could increase the risk of heart attack and stroke." *Rofecoxib for Osteoarthritis*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0013260/ (last visited July 20, 2012).

[18] "Prescription ibuprofen is used to relieve pain, tenderness, swelling, and stiffness . . . . It is also used to relieve mild to moderate pain . . . ." *Ibuprofen*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000598/ (last visited July 20, 2012). Motrin is a brand name for ibuprofen. *Id.*

[19] "Acetaminophen is used to relieve mild to moderate pain . . . " *Acetaminophen*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000521/ (last visited July 20, 2012). Tylenol is a brand name for acetaminophen. *Id.*

at 301-08.) Plaintiff was placed on trazadone[20] on July 20, 2004, which was discontinued and replaced with zolpidem[21] as needed for sleep on October 19, 2004. (Tr. at 307, 304.)

On July 21, 2004, Plaintiff saw Buss for hot, painful swelling in his left knee. (Tr. at 236.) Buss prescribed Vioxx, which was discontinued on September 30, 2004. (Tr. at 307, 305.)

On August 3, 2004, Plaintiff started Hepatitis C treatment with peginterferon injections[22] and ribavirin[23]. (Tr. at 306; *see also* Tr. at 232.) These medications were discontinued in July 2005, upon completion of the treatment. (Tr. at 302.) Plaintiff was subsequently discharged and cleared of the virus. (Tr. at 454.) Plaintiff continued to receive monitoring and was declared to be a sustained virologic responder.[24]

On August 24, 2005, Plaintiff had a positive drug screen for cannabis. (Tr. at 239.) In response to the positive screening, Plaintiff met with Pam Mueller, Ph.D., on October 10, 2005. (Tr. at 280.) Dr. Mueller noted that Plaintiff's symptoms included depressed feelings, low energy, low self-esteem, and long-standing problems with sleep and appetite. (Tr. at 280.) Dr. Mueller recommended the dual diagnosis treatment

---

[20] Trazadone is an antidepressant that can also be used to treat insomnia. *Trazadone*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000530/ (last visited July 20, 2012).

[21] "Zolpidem is used to treat insomnia (difficulty falling asleep or staying asleep). . . . [i]t works by slowing activity in the brain to allow sleep." *Zolpidem*. PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000928/ (last visited July 19, 2012). Ambien is a brand name for zolpidem. *Id.*

[22] "Peginterferon . . . is used alone or in combination with ribavirin (a medication) to treat chronic (long-term) hepatitis C infection. . . . Peginterferon alpha-2b works by decreasing the amount of hepatitis C virus (HCV) in the body." *Peginterferon alfa-2a*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000313/ (last visited July 19, 2012). Peginterferon alfa-2a is sold under the brand name Pegasys. *Id.*

[23]"Ribavirin is used with an interferon medication . . . to treat hepatitis C . . . . It works by stopping the virus that causes hepatitis C from spreading inside the body." *Ribavirin*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000301/ (last visited July 19, 2012).

[24] "Doctors use the term 'sustained virologic response' rather than 'cure' when the virus is removed from the blood, because it is not known whether this will last a person's entire life." *Hepatitis C*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001329/ (last visited July 19, 2012).

program at a St. Cloud treatment facility for marijuana dependence and depression. (Tr. at 280.) On October 25, 2005, Dr. Mueller spoke with Faith Weiss, MSW, LICSW (Plaintiff's case manager), Chip Cox, and Dr. Carl Isenhart to discuss referring Plaintiff to the St. Cloud treatment facility. (Tr. at 280, 403.) Plaintiff had another positive drug screen for cannabis in October. (Tr. at 289.)

On October 25, 2005, Plaintiff's citalopram prescription was increased from 40 mg to 60 mg by Buss. (Tr. at 301.)

### 3. 2006

Plaintiff underwent a psychosocial assessment with Walker, a residential social worker at the Veterans Home, in January 2006. (Tr. at 287.) Walker noted that Plaintiff had a "long history of depressive disorder and polydrug abuse [that has] impacted relationships, employment, etc." and that Plaintiff had been alcohol free for over two years. (Tr. at 287.)

Plaintiff underwent a lumbar spine x-ray in April 2006 that indicated degenerative changes. (Tr. at 292.)[25] Plaintiff was placed on etodolac[26] on April 19, 2006, for low back pain. (Tr. at 299.)

Plaintiff attended physical therapy on June 12, 2006, with Lynn Richards, P.T., of the Veterans Affairs Medical Center ("VAMC"). (Tr. at 364, *see also* Tr. at 292.) Richards evaluated Plaintiff for chronic back pain and some numbness in his leg. (Tr. at

---

[25] The record incorporates by reference this April 2006 lumbar spine x-ray performed by a "VA provider" (*see* Tr. at 292), but records from the Minneapolis Veterans Affairs Medical Center ("VAMC") only date from June of 2006.

[26] Etodolac is used to relieve pain, tenderness, swelling, and stiffness caused by arthritis and other causes. *Etodolac*, PubMed Health, Nat'l Center for Biotechnology, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000904/ (last visited July 19, 2012).

405.) Plaintiff reported that the pain had worsened in the last year after he fell from bed several times. (Tr. at 405.) Plaintiff reported that the pain affected his ability to sleep. (Tr. at 406.) Richards noted that Plaintiff was "generally deconditioned with poor abdominal tone." (Tr. at 406.) Plaintiff had restricted trunk range of movement in all directions with "stiffness" at the end range and mild T-L paraspinal atrophy. (Tr. at 406.) Richards focused on education in self-care, body mechanics, use of ice, and instruction in therapeutic exercise, including stretches. (Tr. at 364, 406.) Richards noted that Plaintiff's motivation was "fair" and that Plaintiff felt his back pain was not severe today, and that things were "resolving on their own." (Tr. at 406.) At the end of the appointment, Richards noted that Plaintiff "has good understanding of 'self-care' for chronic low back pain." (Tr. at 237.)

Plaintiff had an appointment with Weiss for counseling relating to his substance abuse and depression on October 4, 2006. (Tr. at 364, 403.) Plaintiff told Weiss he was "doing well, connecting with his family," and that his medications had been helpful. (Tr. at 403.) Plaintiff requested termination of her counseling services because he felt he no longer needed them. (Tr. at 403.) Weiss terminated services, but told Plaintiff how to obtain them if he needed to. (Tr. at 403.) Weiss updated Plaintiff's Mental Health Treatment Plan, with Plaintiff's input. (Tr. at 403-05.) Plaintiff stated that his goals were to "reintegrat[e] into society and look[] for work, leave the vet's home." (Tr. at 404.) Plaintiff said his strengths were that he was a "people-person" and gets along well with others. (Tr. at 404.) Plaintiff stated his limitations were "lifting." (Tr. at 404.) Plaintiff's health issues included depression, polysubstance abuse (listed in full sustained

15

remission), chronic Hepatitis C, cirrhosis of the liver, and lower back pain.  (Tr. at 404.)

Plaintiff's mood disorder symptoms included "change[s] in mood or unstable mood."

(Tr. at 405.)  The treatment plan for Plaintiff's mood disorder was to meet with VAMC

Addictive Disorders Services staff psychiatrist Gihyun Yoon, M.D., every six months for

psychiatric management.  (Tr. at 405.)

In an October recreation survey for the Veterans Home, Plaintiff indicated no

interest in exercise or sports, but indicated a present interest in walking outdoors, social

activities and events, outdoor sports and activities, and community outings.  (Tr. at 262.)

Plaintiff's listed his depressive disorder as something affecting his activity involvement.

(Tr. at 263.)  Hill recommended general recreation activities and continued participation

in the therapeutic work program.  (Tr. at 264.)

Plaintiff had an appointment with Dr. Yoon on October 11, 2006.  (Tr. at 364.)

Plaintiff told Dr. Yoon that his mood was "good," denied any new stressors, and wanted

to continue his current psychiatric medications.  (Tr. at 401.)  Dr. Yoon noted that

Plaintiff's mood was "mildly depressed" and his depression was "relatively stable."  (Tr.

at 402.)  Dr. Yoon continued Plaintiff's current medications and recommended a return

appointment in six months, or as needed.  (Tr. at 402.)

On November 1, 2006, Buss placed Plaintiff on Flexeril for three days for low

back pain.  (Tr. at 298.)  Plaintiff subsequently went to the VAMC's emergency clinic on

November 3, 2006, and was seen by Debra Shult, R.N., and Eric Chen, M.D.  (Tr. at 398;

see Tr. at 363-64.)  Plaintiff described a "throbbing" pain radiating from his lower back

down his left leg with numb toes at times; indicated the pain was chronic but exacerbated

16

for one week; and rated his pain 7 out of 10. (Tr. at 399.) Plaintiff told Dr. Chen that he had low back pain with radiation down his leg every year, usually around the time the weather starts to change.[27] (Tr. at 397.) Dr. Chen noted the lower lumbar spine region was tender to palpation and prescribed Percocet[28] twice a day for five days in addition to Flexeril. (Tr. at 398; *see also* Tr. at 400, 298.) Plaintiff indicated that weather aggravated the pain while walking and hot baths alleviated the pain. (Tr. at 399.) Plaintiff's prescription for Flexeril was renewed on November 10, 2006. (Tr. at 297.)

### 4. 2007

Plaintiff saw gastroenterology clinical specialist Janet Durfee, ANP-C, at the VAMC on January 4, 2007, for a follow-up appointment regarding his Hepatitis C treatment. (Tr. at 394.) Plaintiff reported feeling "better overall, but . . . [had] periods of significant fatigue." (Tr. at 394.) Durfee noted Plaintiff was in no apparent distress and had no liver lesions. (Tr. at 395.) Durfee re-checked Plaintiff's HCV PCR[29], which was negative, indicating that Plaintiff was a sustained virulogic responder to the treatment. (Tr. at 396.) Durfee did note that Plaintiff had stage 3-4 liver disease with moderate steatosis[30]. (Tr. at 396.)

---

[27] Dr. Chen's notes indicate that the radiation was down Plaintiff's right leg, but other entries from the same visit as well as past history indicate that it was Plaintiff's left leg. (Tr. at 399; *see, e.g.*, Tr. at 310.)

[28] Percocet is a pain reliever composed of two classes of pain relievers, oxycodone and acetaminophen. *Oxycodone*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000589/ (last visited July 13, 2012).

[29] Qualitative blood tests are used to detect the presence or absence of the virus as well as the amount of the virus. *Hepatitis C FAQs for Health Professionals*, Ctr. for Disease Control & Prevention, http://www.cdc.gov/hepatitis/hcv/hcvfaq.htm (last visited August 13, 2012).

[30] "Hepatic steatosis, or fatty liver, is characterized by the excessive accumulation of triglycerides in the form of lipid droplets in the liver" *Hepatic Steatosis Ultrasound Images Assessment*, Nat'l Health & Nutrition Examination Survey III, Ctrs. for Disease Control & Prevention, http://www.cdc.gov/nchs/data/nhanes/nhanes3/Hepatic_Steatosis_Ultrasound_Procedures_Manual.pdf (last visited July 13, 2012).

Plaintiff had a CT scan of his liver and abdomen on February 15, 2007. (Tr. at 408; *accord* Tr. at 363.) The scan showed no evidence of liver mass lesions. Plaintiff had transient jejunal-jejunal intussusception[31] and redundant duodenum. (Tr. at 409.)

In January 2007, Plaintiff underwent another psychosocial evaluation with Walker. (Tr. at 281.) Walker noted that Plaintiff's initial reason for admission to the Veterans Home was depression, chemical dependency, Hepatitis C and secondary loss of employment with financial problems. (Tr. at 281.) Plaintiff's primary psychological diagnosis was listed as major depressive disorder, but Plaintiff also reported problems with periods of low energy and depressed mood throughout his adult life, which Walker indicated might have been exacerbated by situations and self-medication with alcohol, cocaine, and cannabis. (Tr. at 281-82.) Walker also noted that Plaintiff reported "pain to level 7-8 with some chronic pain" from the 1978 herniated disc surgery and that "he may have spasms that go down his legs to his knees." (Tr. at 281.) Plaintiff is "less active" due to his Hepatitis C and back issues. (Tr. at 282.) Walker noted a "long history" of drug and alcohol abuse, including two convictions for driving while intoxicated in 1978 and 1979, a 1976 cannabis possession charge, and a 2003 cannabis possession charge. (Tr. at 282-83.) Plaintiff stated that his goals were to stay sober, stabilize moods, be in remission for Hepatitis C, and to potentially move for independence through DIB and/or employment. (Tr. at 284.)

---

[31] Intussusception is an intestinal obstruction that prevents passage of the intestinal contents. *Intestinal Obstruction*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001306/ (last visited July 26, 2012). Jejunal refers to the middle part of the small intestine. *Small Bowel Resection*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004731/ (last visited July 26, 2012).

On January 30, 2007, Plaintiff saw Buss and W.P. Korchik, M.D., for an annual review and physical exam. (Tr. at 289.) By this time, Plaintiff had resided at the Veterans Home for three years. (Tr. at 289.) Plaintiff remained on citalopram for dysthymic disorder, which he reported "was working well for him." (Tr. at 289.) Plaintiff also stated his mood is "good" and "stable." (Tr. at 289.) Plaintiff reported chronic back pain resulting from his 1978 diskectomy. (Tr. at 289.) Plaintiff took etodolac for the chronic pain and treated flare-ups with narcotics. (Tr. at 290.) Plaintiff reported that he "feels his pain is controlled in varying amounts based on the weather." (Tr. at 289.) Plaintiff admitted a history of sleeping problems, and continued to use zolpidem nightly. (Tr. at 289.) When pressed about his marijuana use, Plaintiff stated that he had not used in a "long time," or at least a year. (Tr. at 289.) Buss noted that, during the exam, Plaintiff remained alert, communicated well, made good eye contact, cooperated, and walked without difficulty. (Tr. at 290.) Buss did find that Plaintiff's "spine is tender with palpation in the lumbar region." (Tr. at 290.) Plaintiff's reflexes were 2+ in the lower extremities. (Tr. at 290.)

Plaintiff saw Dr. Yoon on April 10, 2007, in relation to his substance abuse and depression as well as for medication management. (Tr. at 363.) Plaintiff told Dr. Yoon that he felt "fine" and was glad that a recent Hepatitis C test had come back negative. (Tr. at 392.) Plaintiff indicated he had several "good friends" at the Veterans Home. (Tr. at 392.) Dr. Yoon noted that Plaintiff's medication compliance was "good," his mood was "fine," and Plaintiff was cooperative and made good eye contact. (Tr. at 392-93.) Dr.

Yoon made no changes to Plaintiff's medications and recommended a follow-up visit in six months, or as needed. (Tr. at 393.)

In April 2007, the Veterans Home conducted a 180-day evaluation of Plaintiff. (Tr. at 242.) Walker and Dr. Mueller participated in the evaluation. (Tr. at 424, 245-46.) As a result of the evaluation, Plaintiff was found to have a "medical need" to remain at the Veterans Home. (Tr. at 245.)

Plaintiff continued working at the canteen through April 2007. (Tr. at 255.) In a recreation survey, he indicated no interest in exercise or sports, but indicated both a present and past interest in walking outdoors, outdoor sports and activities, and community outings. (Tr. at 256-57.) Plaintiff indicated that his depressive disorder may affect his activity involvement. (Tr. at 258.) Katherine Wrich, a Veterans Home staff member, recommended general recreation activities and continued participation in the therapeutic work program. (Tr. at 259.)

Plaintiff saw Buss again on June 1, 2007, complaining that his pain medication was no longer effective for his chronic back pain. (Tr. at 292.) Buss discontinued the etodolac, and instead placed Plaintiff on salsalate[32]. (Tr. at 292.)

Dr. Mark Rotty completed a Care Planning Report for Plaintiff on August 20, 2007. (Tr. at 238.) Plaintiff's long term goal was to "continue sobriety and manage depression in structured setting." (Tr. at 238.)

---

[32] "Salsalate is used to relieve pain, tenderness, swelling, and stiffness caused by rheumatoid arthritis (arthritis caused by swelling of the lining of the joints), osteoarthritis (arthritis caused by a breakdown of the lining of the joints), and other conditions that cause swelling." *Salsalate*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000803/ (last visited July 20, 2012).

On August 27, 2007, Plaintiff filled out an Adult Function Report. (Tr. at 180, 189). Plaintiff indicated that his pain makes it difficult to sleep. (Tr. at 183.) Prior to his alleged disability, Plaintiff indicated that he could lift heavy objects and sit or stand for long periods of time, which he can no longer do. (Tr. at 183.) Nurses at the Veterans Home "sometimes" need to page Plaintiff to remind him to take his medications. (Tr. at 184.) His chores include keeping his room tidy and laundry. (Tr. at 184.) Plaintiff shops for personal items once a month. (Tr. at 185.) Plaintiff enjoys woodworking, which he does a couple of hours per week, but can no longer participate in activities that involve physical exertion, such as sports. (Tr. at 186.) Plaintiff attended social outings twice monthly, but was unable to participate in activities that are physically demanding. (Tr. at 186-87.) Plaintiff reported that his pain level affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, and his concentration. (Tr. at 187.) Plaintiff reported that he has a ten-pound lifting restriction. (Tr. at 187.) Plaintiff reported that he could walk six blocks before needing to rest for ten minutes. (Tr. at 187.) Plaintiff also reported that, when stressed, he becomes quiet and withdrawn. (Tr. at 188.) Plaintiff indicated that he used a cane for distances more than several feet or when in "great pain." (Tr. at 188.)

Plaintiff next saw Dr. Yoon on October 9. (Tr. at 363.) Plaintiff told Dr. Yoon that he was depressed since his daughter moved from Minnesota to Utah to be near her mother, but despite this, Plaintiff was able to function as usual. (Tr. at 390.) Plaintiff continued to work at the canteen and spent time with other residents. (Tr. at 390.) Dr. Yoon noted that Plaintiff's medication compliance was "good," he was cooperative, and

had good eye contact, but that Plaintiff's mood was "depressed." (Tr. at 391.) Dr. Yoon

worked with Plaintiff on coping with stress and emotions. (Tr. at 392.)

Plaintiff attended a consultative evaluation with George Adam, M.D., of

Neurology Specialists, LLC, on October 11, 2007. (Tr. at 310.) Dr. Adam found that

Plaintiff "suffers from intermittent weakness, numbness, and pain involving the entire left

leg. The pain shoots from the tailbone through the buttock, into the foot. Standing and

sitting exacerbate these." (Tr. at 310.)

Dr. Adam noted that, during the exam, Plaintiff appeared comfortable and also

observed that

> [a]ll 4 [of Plaintiff's] extremities are strong and well
> coordinated. Tone is normal. Reflexes are brisk and
> symmetric. . . . Sensory examination reveals a subjective
> decrease in light touch and vibration on the left foot dorsally.
> His hamstrings are tight and straight leg raising produces pain
> on the left behind the knee. Lumbar flexion and extension are
> moderately limited. There is a well-healed midline scar
> around which there is tenderness on palpation. Movements of
> the shoulder, elbow, wrist, hip, and knee are normal. There
> are no deformities in any of these joints.

(Tr. at 310.) Dr. Adam concluded that Plaintiff

> has chronic mechanical low back pain. *Prolonged standing,*
> *repetitive lifting and bending could be difficult for him but he*
> *could sit with regularly scheduled breaks.* He is cognitively
> intact and could answer the telephone, deal with clients, and
> use office machinery. His hands are dexterous enough to
> perform tasks requiring fine motor control.

(Tr. at 311 (emphasis added).)

Plaintiff saw Eric R. Slapnicher, O.D., on October 12, 2007, for a routine eye exam at which he received normal results.[33] (Tr. at 314-16.)

Alford Karayusuf, M.D., saw Plaintiff on October 18, 2007, for a consultative evaluation. (Tr. at 320.) Plaintiff's chief complaints were severe depression and back problems. (Tr. at 320.) Dr. Karayusuf reviewed various medical records and care provider communications from the Veterans Home Board. (Tr. at 320.) Dr. Karayusuf noted that Plaintiff had been struggling with constant low back pain since the 1978 laminectomy. (Tr. at 320.) Plaintiff reported that the pain "radiated periodically down his left leg" and that the surgery in 1978 "did not provide anything in the way of relief." (Tr. at 320.) Dr. Karayusuf found that Plaintiff's low back pain had been aggravated over the past 30 years by twisting, stooping, reaching, lifting, prolonged sitting, prolonged standing, prolonged walking, and prolonged lying down. (Tr. at 320.) Plaintiff reported to Dr. Karayusuf that he took Flexeril as well as another medication whose name he could not recall.[34] (Tr. at 320.)

For depression, Plaintiff reported that he took citalopram. (Tr. at 320.) Plaintiff reported he had struggled with "despair and sadness" since 1997, but felt that citalopram had been helpful in improving his mood. (Tr. at 320-21.) Plaintiff told Dr. Karayusuf that his concentration and memory are diminished, he is anxious, he worries, he suffers from occasional racing thoughts, he feels uncertain about the future, he suffers from low self-esteem, and he often feels useless and worthless. (Tr. at 320-21.) Plaintiff denied a

---

[33] Dr. Slapnicher did note myopia, astigmatism, and presbyopia. (Tr. at 316.)
[34] The record suggests that this pain medication is salsalate, first prescribed June 1, 2007. (*See* Tr. at 292; *see also generally supra* n. 32.)

23

history of drug use, despite the fact that his medical records suggest otherwise. (Tr. at

321; *contra* Tr. at 230-31.) Plaintiff did acknowledge a history of alcoholism and stated

that he has been completely sober since September 2003, but from 2001 to 2003 he

consumed one to two liters of liquor per day. (Tr. at 321.) Plaintiff also acknowledged

going through chemical dependency treatment at a St. Cloud treatment facility in 2004.

(Tr. at 321.)

> In terms of daily functioning, Dr. Karayusuf found that Plaintiff

>> has a room without a roommate now, although there is room
>> for a roommate.  He gets up at 6:00 am and as late as 3:00
>> pm.  He goes to bed at 11:00 pm to midnight.  He bathes
>> every day.  He makes his bed every day.  He does no[]
>> cooking and no grocery shopping, as those tasks are done for
>> the residents at this facility.  If he needs to go anywhere, he
>> gets rides from the van available for use for the residents.  He
>> does no dusting, no vacuuming. He does laundry every two
>> weeks. . . . He does not wash dishes . . . .

>> He goes to church services twice a month.  He goes alone.
>> He is not able to concentrate on the services. . . . He watches
>> television sports. . . . He visits with acquaintances and friends
>> he has made who are all other residents of the Veterans Home
>> in Hastings.  He enjoys their company and gets along with
>> them. . . . He has an 18 year old daughter with whom he
>> maintains telephone contact with once per week.

(Tr. at 321.)

Dr. Karayusuf also reported that Plaintiff had impaired recent recall, fair insight,

and dull-normal intelligence.  (Tr. at 322.)  Plaintiff was cooperative, answered all

questions asked, was not restless, had mild to moderate tension, and good eye contact.

(Tr. at 322.)  Dr. Karayusuf diagnosed Plaintiff with dysthymia, alcohol dependence in

remission, and possible substance abuse (based upon referral reports and his review of

record, given Plaintiff denied a history of illicit drug use). (Tr. at 322.) Dr. Karayusuf

concluded that

> [b]ased on his psychiatric and not his physical condition, he is
> able to understand, retain, and follow simple instructions. He
> is also able to interact appropriately with fellow workers,
> supervisors, and the public, provided the communications are
> brief and superficial. Within these parameters he is able to
> maintain pace and persistence."

(Tr. at 322.) Finally, Dr. Karayusuf noted that Plaintiff's mood "looked mildly to

moderately depressed." (Tr. at 322.)

D. Unversaw, PhD., evaluated Plaintiff's records on November 6, 2007, as part of

a Mental Residual Functional Capacity Assessment. (Tr. at 324.) In most categories,

Dr. Unversaw found that Plaintiff was not significantly limited. Dr. Unversaw did find

that Plaintiff was "moderately limited" in the ability to (1) understand and remember

detailed instructions, (2) carry out detailed instructions, (3) maintain attention and

concentration for extended periods of time, and (4) complete a normal work-day and

workweek without interruptions from psychologically based symptoms and perform at a

consistent pace without an unreasonable number and length of rest periods. (Tr. at 324-

25.) Dr. Unversaw gave weight to Dr. Karayusuf's conclusions and determined that

> [t]he claimant can sustain attention and concentration skills to
> carry out work like tasks with reasonable pace and
> persistence. The claimant can respond appropriately to brief
> and superficial contact with co-workers and supervisors. The
> claimant could tolerate stress and pressure typically found in
> an entry level work place." Claimant retains the ability to
> perform routine tasks of a simple nature.

(Tr. at 326.)

Dr. Unversaw also found that Plaintiff's dysthymia was "a medically determinable impairment" for which there was no diagnostic criteria, although no medical findings were noted to substantiate the presence of this impairment. (Tr. at 332.) Dr. Unversaw found that Plaintiff had alcohol dependence and polysubstance dependence in remission, although there were no findings to substantiate the presence of this impairment and they did not satisfy the available diagnostic criteria for substance addiction disorders. (Tr. at 337.) With respect to Listing 12.04 (affective disorders), *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1., Dr. Unversaw found Plaintiff to have "mild" functional limitation of activities of daily living and maintaining social functioning; "moderate" functional limitation as to difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. at 339.)

Sandra Eames, M.D., performed a Physical Residual Functional Capacity Assessment of Plaintiff on November 13, 2007. (Tr. at 353.) Dr. Eames listed Plaintiff's primary diagnosis as "chronic low back pain." (Tr. at 346.) Dr. Eames noted that her conclusions were based on Plaintiff's medical file and the consultative exam with Dr. Adam. (Tr. at 347.)

Dr. Eames found that Plaintiff could "occasionally lift and/or carry" a maximum of 20 pounds and "frequently lift and/or carry" a maximum of 10 pounds. (Tr. at 347.) Plaintiff could stand and/or walk (with normal breaks) and sit with normal breaks for a total of about six hours in a normal work day. (Tr. at 347.) Plaintiff could push and/or pull (including operation of hand and/or foot controls) in an unlimited capacity. (Tr. at 347.)   In terms of postural limitations, Dr. Eames noted that Plaintiff could

"occasionally" climb ramps/stairs, but should "never" climb ladders, ropes, or scaffolds. (Tr. at 348.)  Dr. Eames also noted that Plaintiff could "frequently" balance, stoop, or crouch and "occasionally" kneel or crawl.  (Tr. at 348.)  Plaintiff had no manipulative, visual, or communicative limitations.  (Tr. at 349.)  The only environmental limitation noted was to "avoid concentrated exposure" to hazards such as machinery or heights. (Tr. at 350.)  Dr. Eames found that the symptoms alleged by Plaintiff were due to a medically determinable impairment, the severity and duration of which were consistent with the impairment's expected severity and duration, and whose alleged effect on function was consistent with the impairment.  (Tr. at 351.)

On December 31, 2007, Plaintiff was seen by staff physician Douglas Peterson, M.D., Ph.D., at the VAMC's emergency clinic, complaining of an infected tooth in his right lower jaw accompanied by "sharp" pain and swelling, but no fever.  (Tr. at 386, 389.)  Plaintiff told intake nurse Kristine Pollock, R.N., that he had been to a dental clinic, but he could not afford to have the tooth pulled.  (Tr. at 390.)  Plaintiff believed the tooth was infected.  (Tr. at 390.)  Dr. Petersen prescribed amoxicillin[35] pending a dental appointment if no improvement occurred.  (Tr. at 386-88.)  Plaintiff was subsequently discharged.  (Tr. at 387.)

---

[35] "Amoxicillin is used to treat certain infections caused by bacteria . . ." *Amoxicillin*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000837/ (last visited July 19, 2012).

**5. 2008**

Plaintiff returned to the VAMC's emergency clinic on January 25, 2008, after a non-specific reaction to a PPD tuberculin skin test[36]. (Tr. at 362.) Plaintiff was seen by staff nurse Debra Walker, R.N. ("Nurse Walker"),[37] and staff physician Scott Sorensen, M.D. (Tr. at 382.) Plaintiff received two chest x-rays following his positive test. (Tr. at 407.) Dr. Sorensen noted that the chest x-ray was negative for active disease (normal) and Plaintiff had no symptoms of tuberculosis. (Tr. at 383.) The x-rays showed an "unremarkable" bony thorax, heart size and pulmonary vascularity was within normal range, and lungs were clear of infiltrates and fluids. (Tr. at 408.) Plaintiff indicated he had no other concerns and was subsequently discharged. (Tr. at 383.)

Plaintiff returned to the emergency clinic three days later for a broken front tooth with an exposed root and a blood-pressure check. (Tr. at 362, 380.) Plaintiff reported that the pain in his tooth was "sharp," had been present for three days, was aggravated by temperatures, and alleviated by Motrin. (Tr. at 380.) Plaintiff was seen by staff nurse Phillip Goettl, R.N., and referred to the dental clinic. (Tr. at 381.) The tooth was extracted on January 28, 2008. (Tr. at 362.)

On February 14, 2008, Plaintiff had a CT scan of his abdomen and pelvis; the results were interpreted by Michael Mongeon. (Tr. at 406.) Mongeon found that

---

[36] "This test is done to find out if you have ever come in contact with the bacteria that causes [tuberculosis]. . . . A positive skin test does not necessarily mean that a person has active TB. More tests must be done to check whether there is active disease." *PPD Skin Test*, Medline Plus, U.S. Nat'l Library of Med., http://www.nlm.nih.gov/medlineplus/ency/article/003839.htm (last visited July 26, 2012).
[37] The Court uses the title "Nurse Walker" to differentiate between Debra Walker and Robert Walker ("Walker"), Plaintiff's social worker.

28

Plaintiff's lungs were clear with no pleural or pericardial effusions.[38]   (Tr. at 407.) Plaintiff's spleen, pancreas, gallbladder, adrenal glands, and kidneys were "unremarkable." (Tr. at 406.)  Plaintiff did have a prominent vessel intruding into the stomach lumen immediately below the stomach-esophagus junction. (Tr. at 407.)  No enlarged lymph nodes were identified. (Tr. at 407.)  Additionally, no focal masses in the liver were identified. (Tr. at 407.)

Plaintiff had appointments with Dr. Yoon on February 12 and March 4, 2008. (Tr. at 362.)  At the March 4 appointment, Plaintiff reported "some depression" because he had not seen his family recently. (Tr. at 378.)  Plaintiff also reported that zolpidem worked well for his sleep.  (Tr. at 378.)   No changes were made to Plaintiff's medications. (Tr. at 378.)  Dr. Yoon noted Plaintiff's mood as "mildly depressed" and emphasized psychoeducation and other therapies. (Tr. at 379.)

Plaintiff saw McCarthy again in connection with his liver cirrhosis on March 7, 2008.  (Tr. at 361-62.)  It is not clear from the record what, if any, treatment was recommended.

In April 2008, Plaintiff was seen at the VAMC's emergency clinic twice for a facial rash. (Tr. at 361.)  Plaintiff was first seen on April 20, 2008, by Glennon Kyusun Park, M.D.  (Tr. at 373-74.)   The facial rash was puffy and had a butterfly-like distribution. (Tr. at 373.)  The swelling and redness increased over the next 24 hours and the inflamed area began to feel "tight." (Tr. at 373)  The rash did not respond to over-

---

[38] "[E]ffusion is a buildup of fluid" and can occur in the pleural cavity (lungs and chest) or pericardial cavity (around the heart). *Pleural Effusion*, Medline Plus, U.S. Nat'l Library of Med., http://www.nlm.nih.gov/medlineplus/ency/article/000086.htm (last visited July 26, 2012).

the-counter Benadryl. (Tr. at 373.) Plaintiff reported no new soaps or medications, or any prior history of similar rashes. (Tr. at 373.) Plaintiff was diagnosed with an urticarial rash and prescribed prednisone[39] and cephalexin[40], with an instruction to follow-up in three to five days if rash did not resolve or got worse. (Tr. at 374.) Plaintiff was then discharged.

Three days later, the rash spread to Plaintiff's lower eyelids. (Tr. at 369-70.) Plaintiff returned to the emergency clinic and was seen by Nurse Walker. (Tr. at 373.) Plaintiff reported a pain level of 4-5 out of 10, soreness, and itch associated with the rash. (Tr. at 369.) Plaintiff reported that ice packs helped a little bit, but that the Benadryl was not effective. (Tr. at 369.) Plaintiff also reported itchy eyes and rhinorrhea. (Tr. at 369.)

Plaintiff was referred to the dermatology clinic, where he saw Scott Prawer, M.D. (Tr. at 361, 366.) Dr. Prawer noted that the facial rash could be erysipelas, "although the bilateral nature. . . questions other etiologies such as lupus." (Tr. at 366.) Dr. Prawer took Plaintiff off prednisone, but extended the cephalexin prescription for 14 days and added a prescription for desonide face cream[41]. (Tr. at 366.) Plaintiff did not attend his follow-up appointment on May 2, 2008, but on May 5, a nurse at the Veterans Home confirmed that the rash had resolved. (Tr. at 367.)

---

[39]Prednisone "works . . . by reducing swelling and redness and by changing the way the immune system works." *Prednisone*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000091/ (last visited July 26, 2012). Plaintiff received a five-day prescription for prednisone. (Tr. at 374.)

[40] "Cephalexin is a[n] . . . antibiotic used to treat certain infections caused by bacteria such as . . . skin . . . infections." *Cephalexin*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000762/ (last visited July 26, 2012). Kelflex is a brand name for cephalexin. *Id.* Plaintiff received a seven-day prescription for Kelflex. (Tr. at 374.)

[41] "Desonide is used to treat the redness, swelling, itching, and discomfort of various skin conditions. . . . It works by activating natural substances in the skin to reduce swelling, redness, and itching." *Desonide Topical*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000308/ (last visited July 26, 2012).

Plaintiff submitted an update to his Adult Function Report by filling out Disability Report – Appeal forms in April and July 2008. (Tr. at 193, 209.) In each report, Plaintiff indicated that he had no new physical or mental limitations as a result of his conditions, nor any new illnesses, injuries, or conditions since filing the initial report on August 7, 2007. (Tr. at 193, 204.) In the July update, Plaintiff noted that, since April, he has found it "difficult to maintain activity levels for the amount of time necessary to be competitively employed, fully take part in recreation activities, run errands, etc." (Tr. at 207.)

Dan Larson, M.D., completed a Medical Evaluation of Plaintiff on June 12, 2008. (Tr. at 415.) Plaintiff alleged depressive psychosis and lumbar disc degeneration. (Tr. at 415.) Dr. Larson reviewed the evidence in the file and affirmed the assessment completed November 13, 2007. (Tr. at 416.)

James Alsdurf, Ph.D., L.P., also completed a Medical Evaluation of Plaintiff on June 12, 2008. (Tr. at 414.) Plaintiff alleged depressive psychosis and lumbar disc degeneration. (Tr. at 412.) Dr. Alsdurf noted that Plaintiff was claiming depression and had a long history of substance abuse. (Tr. at 413.) He indicated that his review of the evidence did not change the initial decision rendered on November 13, 2007. (Tr. at 413.)

On June 24, 2008, Plaintiff had an appointment with Dr. Yoon for a psychiatric evaluation after his parole officer ordered a urine analysis in connection with his

31

probation.[42]  (Tr. at 470.)  Dr. Yoon noted that Plaintiff's mood was "mildly depressed" and his mood disorder was "relatively stable."  (Tr. at 471.)  Plaintiff's medications included citalopram, desonide face cream, and zolpidem as needed for sleep.  (Tr. at 471.)

On July 18, 2008, Plaintiff went to a dental emergency clinic regarding another tooth, which been aching for a more than a week and continued to get worse.  (Tr. at 468.)  Meredith Kurysh, D.D.S, extracted the tooth.  (Tr. at 469.)  Plaintiff was prescribed 800 mg ibuprofen for postoperative pain.  (Tr. at 469.)

Plaintiff saw Dr. Yoon again on September 30, 2008, for a psychiatric evaluation after completing a 30-day treatment for cannabis use.  (Tr. at 465.)  Plaintiff told Dr. Yoon that the treatment was "good treatment" and that he "learned more about [his] substance abuse and depression."  (Tr. at 466.)  Plaintiff identified missing his family, some isolation, and the lack of social security benefits as stressors contributing to his depression, which Plaintiff rated as 5 out of 10.  (Tr. at 466.)  Dr. Yoon did note that Plaintiff appeared to be "more motivated and positive" and that he had not consumed alcohol since 2003 and cannabis since August.  (Tr. at 466.)  Plaintiff remained on citalopram, desonide face cream, and zolpidem as needed for sleep.  (Tr. at 466.)  Dr. Yoon listed Plaintiff's mood as "mildly depressed."  (Tr. at 466.)

Plaintiff saw Dr. Yoon again on December 2, 2008.  (Tr. at 463.)  Plaintiff told Dr. Yoon that he was "proud of running a meditation group" at the Veterans Home.  (Tr. at 464.)  Plaintiff denied recent cannabis cravings.  (Tr. at 464.)  Plaintiff reported a

---

[42] Plaintiff was completing a two-year probation sentence for buying alcohol for someone under the age of 21.  (Tr. at 470.)

relatively stable mood, indicating his depression was 5 out of 10 while on citalopram. (Tr. at 464.) Dr. Yoon continued Plaintiff's citalopram and zolpidem prescriptions and added gabapentin[43]. (Tr. at 464; *see also* Tr. at 220.) Dr. Yoon noted that Plaintiff's mood was "mildly depressed," but that his mood disorder was "relatively stable." (Tr. at 465.)

### 6. 2009

Plaintiff saw Dr. Yoon again on February 12, 2009, for a psychiatric evaluation. (Tr. at 458.) Plaintiff reported that he attended five meditation groups and two alcoholic recovery meetings per week. (Tr. at 458.) Plaintiff told Dr. Yoon that he was trying to see things in a "positive" way and that his depression was between 4 and 5 out of 10. Plaintiff reported that other residents contributed to his depression, but that he "handle[s] them well in general." (Tr. at 458.) Dr. Yoon continued the citalopram and zolpidem prescriptions. (Tr. at 458.) Dr. Yoon noted that Plaintiff's mood was "mildly depressed"; his insight and judgment were "good"; and his mood disorder was "relatively stable." (Tr. at 459.)

Robin Stender, R.N., reviewed Plaintiff's mental health treatment plan on February 12, 2009. (Tr. at 459.) Plaintiff's care level corresponded to one hour per month or less of psychiatric care. (Tr. at 460.) Stender noted that Plaintiff's alcohol screening test was negative and Plaintiff reported "never" consuming a drink containing alcohol within the past year. (Tr. at 461.) Stender did note that a post-traumatic stress

---

[43] Gabapentin is an anticonvulsant that can be used to treat seizures, some types of pain, and restless leg syndrome, among other conditions. *Gabapentin*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940/ (last visited July 26, 2012). It is not clear from the record what the medication was prescribed to treat. (*See* Tr. at 220; *see also* Tr. at 464-65.)

33

disorder screening test was positive, with a score of 3. (Tr. at 463.) When asked if he felt "hopeless about the present or future," Plaintiff responded, "No." (Tr. at 463.)

On February 12, 2009, Plaintiff had a CT scan of his abdomen to check for liver cancer. (Tr. at 425.) The scan indicated no focal mass lesions within the liver (normal). (Tr. at 425.) Plaintiff's spleen, adrenals, kidneys, pancreas, and associated veins appeared normal. (Tr. at 425.) No abnormal lytic or blastic bone lesions were noted. (Tr. at 425.) Lung bases demonstrated atelectasis[44], but were "otherwise clear." (Tr. at 425.) The scan showed an increase in the number of lymph nodes on the liver at the porta hepatis, falciform ligament, and gastrohepatic ligament. (Tr. at 425.) At that time, the falciform ligament node measured 1.4 cm. (Tr. at 425.) The final conclusions were no liver masses (normal) and increased lymphadenopathy[45] at the porta hepatis and falciform ligament. (Tr. at 226.) Plaintiff received information about the results of this scan and an alpha fetoprotein ("AFP") blood test[46], which checked for liver tumors, in a letter dated February 9, 2009. (Tr. at 457.) The results of the blood test AFP were normal. (Tr. at 457.)

On February 19, 2009, Buss met with a "Dr. Pocha" to discuss the results of Plaintiff's February 12, 2009 abdominal CT scan. (Tr. at 457.) Neither Buss nor Dr.

---

[44] "Atelectasis is caused by a blockage of the air passages . . . or by pressure on the outside of the lung. . . . In an adult, atelectasis in a small area of the lung is usually not life threatening." *Atelectasis*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001130/ (last visited July 26, 2012).

[45]Lymphadenopathy, or "[l]ymphofollicular hyperplasia is an increase in the size of the lymph node follicles. [The] body produces more lymphocytes to help the lymph nodes prevent bacteria, viruses, and other types of germs from entering the bloodstream." *Lymphofollicular Hyperplasia*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002353/ (last visited July 26, 2012).

[46] "Alpha fetoprotein (AFP) is a protein normally produced by the liver . . . of a developing baby during pregnancy. . . . AFP probably has no normal function in adults." *Alpha fetoprotein*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004041/ (last visited July 26, 2012). Higher than normal AFP can be an indication of liver disease. *Id.*

34

Pocha thought the increased lymphadenopathy was related to Plaintiff's Hepatitis C because it had not appeared on previous scans, and therefore was likely an isolated incident. (Tr. at 457.) Additionally, the abdominal CT scan results indicated no evidence of lymphoma. (Tr. at 457.)

In connection with the increased lymphadenopathy findings, Sharon Luikart, M.D., performed an oncology consult. (Tr. at 452.) Dr. Luikhart noted that the results from Plaintiff's February 12, 2009 CT scan were "quite indeterminate," and recommended that Plaintiff to undergo a PET scan[47] and discuss the possibility of biopsy. (Tr. at 452.) She indicated that, if the PET scan was positive or the lymphadenopathy continued to worsen, biopsy would need to be discussed. (Tr. at 452.)

Plaintiff met with Buss to discuss the results of the February abdominal CT scan and subsequent oncology consult on March 5, 2009. (Tr. at 454, 456.) At the meeting, Plaintiff told Buss that he felt "good." (Tr. at 454.) Buss also noted that Plaintiff was under "no apparent distress." (Tr. at 455.) Buss told Plaintiff she would proceed with the recommendations of Dr. Pocha to repeat the CT scan in a year and the AFP test in six months. (Tr. at 456.)

Plaintiff underwent a colonoscopy on April 13, 2009, the results of which were normal. (Tr. at 451, 453.)

On May 29, 2009, Plaintiff underwent a CT scan of his chest, abdomen, and pelvis. (Tr. at 423-24.) The results indicated new lymphadenopathy on his liver at the

---

[47] A positron emission tomography (PET) scan is an imaging test . . . . [that] shows how organs and tissues are working." *PET Scan*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004284/ (last visited July 26, 2012).

porta hepatis. (Tr. at 423.)  The scan showed a 5 mm pleural based non-calcified nodule located along the right major fissure in Plaintiff's lung and a smaller pleural based nodule towards the middle of the 5 mm nodule.  (Tr. at 424.)  Plaintiff also had a 2 mm noncalcified nodule in the right middle lobe of the lungs.  (Tr. at 424.)  The scan also showed fibro-atelectic change in the lateral segment of the right middle lobe of the lungs and a tiny subpleural nodule in the left lower lobe of the lungs.  (Tr. at 424.)  There was no pleural or pericardial effusion or lymphadenopathy in Plaintiff's chest.  (Tr. at 424.)  The scan of the abdomen and pelvis indicated no liver lesions and unchanged lymphadenopathy[48] in Plaintiff's liver at the porta hepatis, gastrohepatic ligament, and falciform ligament.  (Tr. at 424.)  Plaintiff's spleen, kidneys, pancreas, appendix, and adrenal glands were normal.  (Tr. at 424.)  Plaintiff had no "aggressive appearing bony lesions."  (Tr. at 424.)  The final conclusions of the CT scans were (1) no evidence of liver cancer, (2) stable lymphadenopathy of the liver at the in the porta hepatis and falciform ligament, and (3) lung nodules.  (Tr. at 424.)

On June 30, 2009, Plaintiff had a follow-up PET body imaging scan.  (Tr. at 422.) Plaintiff's portal and falciform ligament lymph nodes were again PET negative as were his liver and lungs.  (Tr. at 423.)

Plaintiff next saw Dr. Yoon on June 11, 2009.  (Tr. at 448.)  Plaintiff rated his depression 4 out of 10, but was concerned about his medical problems.  (Tr. at 449.) Plaintiff denied other stressors besides his medical conditions.  (Tr. at 449.)  Plaintiff reported that he attended a meditation group daily and ran the group four times per week.

---

[48] This was compared to the results of the February 12, 2009 abdominal CT scan. (Tr. at 424.)

(Tr. at 449.) Dr. Yoon noted that Plaintiff's mood was "mildly anxious" and his thought-process was "goal-oriented." (Tr. at 450.) Dr. Yoon listed Plaintiff's mood disorder as "relatively stable" and his substance dependence as "in remission." (Tr. at 451.) On June 25, 2009, Dr. Yoon added a prescription for hydroxyzine[49] for anxiety. (Tr. at 451; *see also* Tr. at 220.)

On June 12, 2009, Stender entered an addendum to Plaintiff's Mental Health Treatment Plan calling for medication management appointments with the ADS Clinic every four months to monitor medication compliance, efficacy, and adverse side effects. (Tr. at 448.) The addendum also called for Plaintiff to be educated in self-management strategies to help him manage his mood disorder and substance abuse. (Tr. at 448.)

On June 29, 2009, Plaintiff saw Weiss for a supportive therapy session. (Tr. at 446.) The appointment was made in response to positive drug tests for cannabis on June 17 and again on June 24, which violated both Plaintiff's probation and the rules of the Veterans Home. (Tr. at 446; *see also* Tr. at 429.) Plaintiff told Weiss that he used cannabis to try and help him with stress, but that it "doesn't really do anything." (Tr. at 446-47.) Plaintiff indicated he had used cannabis a "few times" during the last one and one-half months. (Tr. at 447.) Weiss noted that Plaintiff was "concerned" and "anxious" about his health, his mood was "anxious," his insight was "poor," and his judgment was "fair." (Tr. at 447.)

---

[49] Hydroxyzine is "used for anxiety and to treat the symptoms of alcohol withdrawal." *Hydroxyzine*, PubMed Health, Nat'l Center for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000796/ (last visited July 26, 2012).

Plaintiff had another appointment with Weiss on July 27, 2009. (Tr. at 444-45.) Weiss noted that Plaintiff listened attentively, appeared ready to learn, and was pleasant and cooperative. (Tr. at 445.) Plaintiff told Weiss that he attended meetings at the Veterans Home and was attending therapy sessions with Dr. Mueller and a psychologist named Jennifer. (Tr. at 445.) Plaintiff told Weiss that he was not using cannabis and that "everything is going well." (Tr. at 445.) Weiss noted that Plaintiff's mood was "good" and that his insight and judgment were "fair." (Tr. at 445.)

In August 2009, Plaintiff was enrolled in the lung nodule clinic by Angela Baker, R.N., in response to his May CT results and guidelines recommending that lung nodules be followed for a period of two years to ensure their stability. (Tr. at 442.) Plaintiff received notification about these nodules from Jeffery Rubins, M.D., of the Pulmonary Medicine department in a letter dated August 6, 2009. (Tr. at 443.) Plaintiff's next scan was scheduled for December 22, 2009. (Tr. at 444.)

Plaintiff saw Weiss again on October 9, 2009. (Tr. at 440.) Weiss again noted that Plaintiff was pleasant and cooperative, and Plaintiff told Weiss that he was "doing well." (Tr. at 441.) Plaintiff told Weiss he was staying active and felt good about himself. (Tr. at 441.) Plaintiff hoped to get social security disability, but was not ready to leave the Veterans Home. (Tr. at 441.) Weiss noted Plaintiff's mood, insight, and judgment as "good." (Tr. at 441.)

On October 13, 2009, Plaintiff saw Dr. Yoon. (Tr. at 439.) Dr. Yoon noted that Plaintiff's mood was "manageable" and Plaintiff reported that, with respect to his lung nodule and medical issues, he saw medical providers regularly and did not "worry too

much about it." (Tr. at 439.)  Dr. Yoon noted that Plaintiff was "mildly depressed" and his mood disorder was "relatively stable." (Tr. at 440.)  Plaintiff's drug dependence was listed as "in remission." (Tr. at 440.)  Dr. Yoon discontinued the hydroxyzine. (Tr. at 440.)

On November 18, 2009, Plaintiff had a CT scan of his abdomen. (Tr. at 421.)  The results showed no thoracic lymphadenopathy or pleural or pericardial effusion. (Tr. at 421.)  Plaintiff did have "mild fibro atelectatic changes at the lung bases" and small stable pulmonary nodules, but these were unchanged from the previous scan. (Tr. at 421.)  The scan indicated no bone or upper abdominal abnormalities. (Tr. at 422.)

**C. Hearing Testimony**

Plaintiff appeared at the hearing along with counsel and Walker.  (Tr. at 29.) Plaintiff testified that he had lived at the Veterans Home since 2004. (Tr. at 37.)  Plaintiff testified that, as the result of his divorce, he started using alcohol and marijuana as an escape mechanism. (Tr. at 38-39.)  Plaintiff testified that his alcohol use caused him to miss work and he was ultimately terminated. (Tr. at 38, 43.)

Plaintiff explained that, in 1978, he injured his back while removing concrete posts for the installation of a guardrail. (Tr. at 40.)  When traction failed to provide any relief, Plaintiff underwent a laminectomy. (Tr. at 41.)  Plaintiff subsequently returned to construction, but was only able to work for a few weeks. (Tr. at 42.)

Plaintiff testified that, after he left construction, he had a series of sales positions, which included insurance, motorcycles, and cars. (Tr. at 42.)  Plaintiff stated that he tried

to stay under the ten-pound lifting restriction that had been imposed in 1978 following the construction injury. (Tr. at 42.)

As for his daily activities, Plaintiff testified that he performs all of his own personal cares. (Tr. at 43.) Plaintiff also runs a morning meditation group four times per week. (Tr. at 47.) Plaintiff testified that, on a typical day, he gets up, runs the meditation group, and then "tr[ies] to socialize as much as [he] can around the area." (Tr. at 49.)

Plaintiff also testified that he currently works as a cashier at the canteen eight hours per week and that there is no lifting associated with his position. (Tr. at 39, 43.) Occasionally, Plaintiff helps out at the coffee shop. (Tr. at 49.) Sometimes, Plaintiff takes a walk, but this is more difficult in the winter due to increased pain. (Tr. at 50.) Plaintiff stated that he does his own laundry, but otherwise the Veterans Home handles all other household chores. (Tr. at 43-44.) Plaintiff testified that he can walk one to two miles before he needs to stop and that he has no difficulty with the functioning of his arms and hands. (Tr. at 44.)

As for substance use, Plaintiff testified that he has abstained from alcohol since 2003. (Tr. at 44.) Plaintiff testified that he has been through chemical dependency treatment twice and he last used marijuana in September 2008. (Tr. at 44-45.) Plaintiff currently smokes approximately one-half of a pack of cigarettes every day. (Tr. at 44.)

With respect to his depression, Plaintiff testified that he tends to "isolate in [his] room" and want to use marijuana "just to get away and forget about things." (Tr. at 50.) Plaintiff explained that chemical dependency treatment has helped him to understand

what are his triggers and to respond proactively to them by talking with someone. (Tr. at 50-51.)

Plaintiff testified that his back condition has stayed the same over the last five years, but gives him more trouble during the wintertime. (Tr. at 51.) Plaintiff also stated that the damage to his liver causes him to feel fatigued. (Tr. at 51.)

Walker also testified at the hearing. (Tr. at 52.) Walker testified that he has been working with Plaintiff for about as long as Plaintiff has resided at the Veterans Home. (Tr. at 53.) Walker explained that he is a licensed social worker and assists residents of the Veterans Home "in more of a general sense," such as helping them get in touch with a treatment provider. (Tr. at 52-54.) Walker testified that he also runs a weekly chemical dependency group that Plaintiff has attended in the past. (Tr. at 55.) Walker does not prescribe medication and is not licensed to perform therapy or diagnosis. (Tr. at 52, 55.)

Walker testified that he sees Plaintiff two to three times per week, including when Plaintiff attends Walker's chemical dependency group and in passing as Walker's office is near Plaintiff's room. (Tr. at 56.) Walker testified that he also visits Plaintiff to check in with him and see how he is doing. (Tr. at 56.) When asked about Plaintiff's social functioning, Walker responded that "he tends to be somewhat of a loner"; is "friendly to people when he does interact with them"; and avoids getting "deeply involved with anyone." (Tr. at 56.) Walker testified that Plaintiff is

> not a social leader . . . and he generally spends a portion of
> each day by himself in his room. He usually naps every day
> either late morning or mid-afternoon. . . . He spends most of
> his time in the facility. He doesn't go out in the community

> and socialize or attend outside churches or activities at this
> point in his life.

(Tr. at 57.)

As for Plaintiff's ability to concentrate and accomplish certain tasks, Walker stated

that Plaintiff

> doesn't seem to be able to set very large goals and work
> towards them. And that when he's in a stressful situation—
> there was reference made to working with his probation
> officer and things like that. He's needed my assistance
> sometimes to stay on track with that to follow what he really
> has to do and to . . . be timely with things.

(Tr. at 57.) Walker also testified that Plaintiff "needs cues on different things to stay on

track or set a goal." (Tr. at 57.)

The ALJ also asked Walker how he thought Plaintiff would do outside of the

"very structured and supportive environment" of the Veterans Home. (Tr. at 59.) Walker

testified that he believed Plaintiff "would be at a relatively high risk for depression

returning or a chemical dependency relapse." (Tr. at 59.) Walker also testified that

Plaintiff is "looking probably at his best right now with sobriety and a supportive living

place" and that Plaintiff "tends when he's out by history and by his nature of relapse in

our facility to be very suggestible to influences when he is out of a structured

environment." (Tr. at 59.)

During the hearing, the ALJ posed several hypotheticals to the vocational expert

based on a hypothetical individual's ability to perform a modified range of light work,

which consisted of (1) lifting no more than 20 pounds occasionally and frequently up to

10 pounds; (2) additional restrictions related to unprotected heights, dangerous machines,

ladders, ropes, and scaffolds; (3) the occasional use of ramps or stairs, kneeling, or crawling; (4) simple, routine tasks; and (5) a drug and alcohol-free environment. (Tr. at 61-62.) This individual could, however, frequently balance, stoop, and crouch. (Tr. at 62.) The vocational expert testified that this hypothetical person could perform light, unskilled work, such as cashier, office helper, and housekeeper/cleaner. (Tr. at 63.)

With the additional limitation that the position involve simple, routine tasks with brief, superficial contact with others, the vocational expert testified that the office helper position would no longer be available. (Tr. at 63.) Finally, if the hypothetical individual was also to avoid slippery surfaces and extreme cold, the vocational expert testified that only the cashier position remained. (Tr. at 64.)

### D. Decision of the ALJ

The ALJ found and concluded that Plaintiff has not engaged in substantial gainful activity from the alleged onset date of August 15, 2003, through December 31, 2008; Plaintiff has the severe impairments of lumbago with low back pain, chronic hip pain, major depressive disorder, and chemical dependency; and these impairments, when considered individually or in combination, do not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. at 17-18.) The ALJ found that Plaintiff has the residual functional capacity to perform light work, "defined as lifting up to 20 pounds occasionally and 10 pounds frequently and standing and/or walking up to 6 hours and sitting up to 6 hours in an 8[-]hour workday" with the additional limitations of not working in hazardous conditions; not requiring the use of ladders, ropes, and scaffolds; no more than the occasional climbing of stairs and ramps, keeling, and

crawling; and the performance of simple, routine tasks in a alcohol and drug-free environment. (Tr. at 18.) In consideration of Plaintiff's age, education, work experience, and modified light residual functional capacity, the ALJ concluded that a significant number of jobs exist in the national economy that Plaintiff could perform and, therefore, Plaintiff has not been under a disability, as defined in the Social Security Act, since September 7, 2006. (Tr. at 24.)

With respect to Plaintiff's physical impairments, the ALJ found that Plaintiff "has not demonstrated any significant neurological deficits on examination and has not demonstrated an inability to ambulate effectively." (Tr. at 18.) As for Plaintiff's mental impairments, the ALJ found that these impairments did not cause at least two marked limitations, or one marked limitation with repeated episodes of decompensation. (Tr. at 18.)

The ALJ observed that medication often relieved Plaintiff's symptoms and that the overall conservative course of Plaintiff's treatment was inconsistent with an assertion of disability. (Tr. at 19-22.) In addition, the ALJ found that while Plaintiff "endorses difficulty maintaining attention and concentration, no treating source has observed him to have difficulty following instructions or maintaining attention and concentration for normal conversation"; Plaintiff has experienced no episodes of decompensation; and "no treating source has opined that [Plaintiff] is unable to function outside of this supportive environment." (Tr. at 22.)

### III.   Standard of Review

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011). "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." *Id.* This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Id.* If the ALJ's decision is supported by substantial evidence in the record as a whole, reversal is not warranted despite the fact that some evidence may support a different conclusion or substantial evidence exists to support an opposite conclusion. *Id.*; *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009). This Court "do[es] not re-weigh the evidence presented to the ALJ and . . . defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Gulliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citation omitted).

Pursuant to Title II of the Social Security Act, DIB are available to individuals who have not yet attained the age of retirement and are under a disability. *See* 42 U.S.C. § 423(a) (discussing criteria for eligibility); 20 C.F.R. § 404.315 (same). An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1501. This standard is met only if a claimant has a severe physical or mental

45

impairment, or impairments, that renders him unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(1). The ALJ "consider[s] whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work." *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010); *see also* 20 C.F.R. § 404.1520(a)(4). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a).

## IV.   Analysis

In his motion for summary judgment, Plaintiff raises five challenges to the Commissioner's denial of DIB: (1) the record lacks substantial evidence to support the finding that Plaintiff could perform a modified range of light work; (2) the ALJ erred by not obtaining medical expert testimony to determine if Plaintiff met or equaled the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.04 (disorders of the spine), 12.04 (affective disorders); (3) the ALJ failed to consider the opinions of Plaintiff's social worker; (4) the record lacks substantial evidence that Plaintiff is capable of full-time employment; and (5) the record lacks substantial evidence that Plaintiff is cable of employment on a regular and continuing basis. (Docket No. 10, Pl.'s Mem. in Supp. of Summ. J. at 9-10, 12, 14-16.)

In the Commissioner's cross motion for summary judgment, the Commissioner asserts that the record contains substantial evidence to support the ALJ's decision on Plaintiff's ineligibility for DIB and the ALJ's decision reflects that all the evidence was considered, including the opinions of Plaintiff's social worker. (Docket No. 18, Def.'s Mem. in Supp. of Summ. J. at 1, 8-15.)

## A. Whether Plaintiff Met or Equaled Listings 1.04 and 12.04

The Court first begins with Plaintiff's contention that the ALJ erred by not obtaining medical expert testimony to determine whether Plaintiff's impairments met or equaled Listings 1.04 and 12.04.

"The claimant has the burden of proving that his impairment meets or equals a listing. To meet a listing, an impairment must meet all of the listing's specified criteria." *Carlson v. Astrue*, 604 F.3d 589, 593 (8th Cir. 2010) (quotation omitted). "Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing. An impairment that manifests only some of the listing criteria, no matter how severely, does not qualify." *McCoy v. Astrue*, 648 F.3d 605, 611-12 (8th Cir. 2011) (quotation omitted).

### 1. Listing 1.04

Listing 1.04 addresses disorders of the spine which "result[] in compromise of a nerve root . . . or the spinal cord" with

> [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss

> and, if there is involvement of the lower back, positive
> straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A).  "Regardless of the cause(s) of a

musculoskeletal impairment, functional loss . . . is defined as the inability to ambulate

effectively on a sustained basis for any reason, including pain . . . , or the inability to

perform fine and gross movements effectively on a sustained basis for any reason,

including pain . . . ."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2).

Plaintiff cites to records from 1993 and 1994 in support of nerve root involvement.

(Pl.'s Mem. in Supp. of Summ. J. at 11; *see also* Tr. 476-82, 479.)  These records,

however, do not bear on his current condition.  When Plaintiff was admitted to the

Veterans Home, there was nerve damage which caused some loss of sensation, but

Plaintiff denied any trouble with coordination, weakness, numbness, or tingling.  (Tr. at

232.)  Dr. Adam described Plaintiff's reflexes as "brisk and symmetric."  (Tr. at 310.)

And, as noted by the ALJ, there is no evidence of an "inability to ambulate effectively."

(Tr. at 18.)  Plaintiff must meet all of Listing 1.04's criteria in order to show that his

impairment constitutes a disorder of the spine; Plaintiff has not done so.  Accordingly,

this Court concludes that there is substantial evidence to support the ALJ's finding that

Plaintiff's low back pain did not meet or equal Listing 1.04.

### 2. Listing 12.04

Listing 12.04 applies to affective disorders, which are "[c]haracterized by a

disturbance of mood accompanied by a full or partial manic or depressive syndrome.

Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

### a.  A & B Criteria

There is no dispute that Plaintiff suffers from a major depressive disorder.  (Tr. at 17; Def.'s Mem. in Supp. of Summ. J. at 13.)  But in order to constitute a disability, Plaintiff's major depressive disorder must also result in two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of extended decompensation. *Id.* § 12.04(B).  A restriction or difficulty is marked if the limitation is "more than moderate but less than extreme." *Id.* § 12.00(C).  "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." *Id.*

As there is no evidence any episode of extended decompensation (*see* Tr. at 18, 320-22, 339), Plaintiff's depressive disorder must result in at least two marked limitations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B).  Substantial evidence in the record supports the ALJ's finding that Plaintiff suffers only mild and moderate limitations.  (Tr. at 17.)   Plaintiff frequently reported that medication helped with his depression.  (*See, e.g.*, Tr. at 278, 289, 320-21, 392, 403.)  "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Wildman v. Astrue*, 596 F.3d 959, 965 (8th Cir. 2010) (quotation omitted).   While Plaintiff's

depression has fluctuated somewhat between 2006 and 2009, Dr. Yoon repeatedly described Plaintiff's depression as "mild" and his mood as "stable" during this period of time. (*See* Tr. at 379, 402, 440, 451, 459, 465-66, 470-71; *see also* Tr. at 392, 450.) Further, Plaintiff's work reviews, socializing with other residents at the Veterans Home, and attending and leading meditation sessions demonstrate that any difficulties in social functioning were not marked. (*See* Tr. at 186-87, 273-74, 321, 390, 392, 449, 464.)

### b.  C Criteria

Alternatively, Plaintiff had to establish that he had a "medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support" and (1) repeated episodes of decompensation, (2) "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate," or (3) "[c]urrent history of 1 or more years inability to function outside of a highly supportive living arrangement, with an indication of continued need for such an arrangement." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C).  The ALJ "considered whether the 'paragraph C' criteria were satisfied" and determined that "the evidence fails to establish the presence of the 'paragraph C' criteria." (Tr. at 18.)

As stated above, Plaintiff has not experienced any episodes of decompensation. There is no evidence to indicate that minimal changes in mental demands or environment

would cause Plaintiff to decompensate.  Therefore, Plaintiff does not satisfy the (C)(1) or (C)(2) criteria.

With respect to the (C)(3) criteria, however, the record shows that Plaintiff has resided at the Veterans Home since January 2004.  (*See* Tr. at 35-36, 37, 230, 320.)  In April 2007, it was determined that Plaintiff had "a medical need" to be at the Veterans Home, a determination that included input from Dr. Mueller.  (Tr. at 245.)  The Veterans Home is a highly supportive environment.  The Veterans Home provides meals to its residents, offers some psychology support services, transports residents to and from medical appointments, and administers all medication.  (Tr. at 58.)  The only household chores Plaintiff does for himself are laundry and keeping his room tidy; everything else is taken care of by the Veterans Home.  *See Gonsalves v. Astrue*, No. 09-181-BW, 2010 WL 1935753, at *4 (D. Me. May 10, 2010) (describing a "highly supportive living arrangement" as a "shelters or group homes, inpatient psychiatric treatment, or an inability to live on one's own").  Although the April 2007 determination is the only medical evidence in the record affirmatively stating that Plaintiff has a medical need to be in this highly supportive environment, there is no evidence indicating a change in Plaintiff's condition prior to December 31, 2008, Plaintiff's date last insured.

There is no dispute that Plaintiff suffers from a major depressive disorder.  (Def.'s Mem. in Supp. Summ. J. at 13).  There is no dispute that Plaintiff is taking medication for his depression.  Plaintiff has a history of needing to be in a highly supportive environment and there is no evidence that this need has diminished, which indicates a continuing need for this type of environment.  Therefore, this Court concludes that the

ALJ's determination regarding the (C)(3) criteria is not supported by substantial evidence. Rather than reverse the ALJ's decision, however, this Court concludes that is more appropriate to remand this matter for further development of the record on this point and for reconsideration of whether Plaintiff's major depressive disorder meets Listing 12.04(C)(3). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C).

### B. ALJ's Consideration of Walker's Testimony

With respect to Walker's testimony, Plaintiff asserts that the ALJ "not only ignore[d] evidence presented by this long-term, long-time caregivier to the claimant, the ALJ didn't even mention Mr. Walker's appearance and testimony at the hearing." (Pl.'s Mem. in Supp. of Summ. J. at 14.)  Plaintiff argues that the ALJ failed to consider Walker's testimony and such failure constitutes reversible error. (Pl.'s Mem. in Supp. of Summ. J. at 14.)

The Commissioner responds that simply because Walker's testimony was not cited by the ALJ does not mean that the ALJ did not consider the testimony and argues that "the ALJ specifically explained that he considered all of the opinion evidence in accordance with the requirements with various regulations and S[ocial] S[ecurity] R[ulings] ("SSR")], including SSR 06-03p, which is the precise ruling addressing opinions from individuals like Walker, who are not "'acceptable medical sources.'" (Def.'s Mem. in Supp. Summ. J. at 14.)

The Commissioner is correct that Walker is not an "acceptable medical source," but, rather, is an "other non-medical source." (Def.'s Mem. in Supp. Summ. J. at 14.) *Compare* 20 C.F.R. § 404.1513(a) *with* (d). As explained in SSR 06-03p,

"[n]on-medical sources" who have had contact with
the individual in their professional capacity, such as teachers,
school counselors, and social welfare agency personnel who
are not health care providers, are also valuable sources of
evidence for assessing impairment severity and functioning.
Often, these sources have close contact with the individuals
and have personal knowledge and expertise to make
judgments about their impairment(s), activities, and level of
functioning over a period of time. . . .

Although [the regulations] do not address explicitly
how to evaluate evidence (including opinions) from "other
sources," they do require consideration of such evidence
when evaluating an "acceptable medical source's" opinion.
For example, [the] regulations include a provision that
requires adjudicators to consider any other factors brought to
our attention, or of which we are aware, which tend to support
or contradict a medical opinion.   Information, including
opinions, from "other sources"—both medical sources and
"non-medical sources"—can be important in this regard.   In
addition, and as already noted, the Act requires us to consider
all of the available evidence in the individual's case record in
every case.

SSR 06-03p, 2006 WL 2329939, at *3-4 (Aug. 9, 2006).

Walker is a licensed social worker and has worked with Plaintiff for over five

years.   (Tr. at 52-53.)   Walker leads a weekly chemical dependency group, which

Plaintiff attends, and typically sees Plaintiff two or three times per week.   (Tr. at 55-56.)

Walker also frequently sees Plaintiff in passing.   (Tr. at 56.)   At the hearing, Walker

testified, among other things, that Plaintiff has difficulty setting goals and working

towards them and often needs assistance to stay on track.   (Tr. at 57.)   When asked by the

ALJ how Plaintiff "would do outside of the very structured and supportive environment"

of the Veterans Home, Walker responded that Plaintiff "would be at a relatively high risk

for depression returning or a chemical dependence relapse" and that, based on Plaintiff's

history, Plaintiff tends "to be very suggestible to influences when he is outside of a structured environment." (Tr. at 59.)

The ALJ did not note Walker's appearance at the hearing in his decision. (Tr. at 15.) Aside from Plaintiff and the vocational expert, Walker was the only other person who provided testimony at the hearing. (*See* Tr. at 31-67.) The only indication that the ALJ may have considered Walker's testimony in rendering his decision is the ALJ's generic reference to having "considered opinion evidence in accordance with the requirements of 20 C.F.R. [§] 404.1527 and SSRs 96-2p, 96-5p, 96-6p[,] and *06-3p*." (Tr. at 19 (emphasis added).)

The "ALJ is not required to discuss every piece of evidence submitted" and the "failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman*, 596 F.3d at 966 (quotations omitted). In this case, however, the evidence not discussed touches on Plaintiff's ability to function outside of a highly supportive environment and, consequently, on whether Plaintiff meets Listing 12.04(C)(3). While not an "acceptable medical source," Walker's opinion was still entitled to consideration as part of all the available evidence. *Tindell v. Barnhart*, 444 F.3d 1002, 1004 (8th Cir. 2006); SSR 06-03p, 2006 WL 2329939, at 4; *see also Canales v. Comm'r of Soc. Sec.*, No. 08-cv-5019 (FB) (SMG), 698 F. Supp. 2d 335, 344 (E.D. N.Y. March 26, 2010) ("While the ALJ was free to conclude that the opinion of a licensed social worker was not entitled to any weight, the ALJ had to explain that decision."). Given that this evidence touches on the very subject that this Court has determined should be remanded for further development and there is no specific

54

reference to any of Walker's testimony, this Court is hard pressed to conclude that Walker's testimony was appropriately considered by the ALJ. *Cf. Wildman*, 596 F.3d at 966 (ALJ's specific references to psychiatrist's findings but not statement that claimant was "markedly limited" by her medical problems made it highly unlikely that psychiatrist's statement was not considered and rejected).

## C. Plaintiff's Residual Functional Capacity

Because this Court recommends that this matter be remanded for consideration of whether Plaintiff's major depressive disorder meets Listing 12.04(C)(3), the Court need not reach the issue of whether the ALJ's determination of Plaintiff's RFC is supported by substantial evidence because the determination of a claimant's RFC comes only after the ALJ has determined that the claimant does not meet or equal a listed impairment. *See* 20 C.F.R. § 404.1520(a)(iv). In the interests of completeness, however, the Court considers whether there is substantial evidence to support the ALJ's RFC determination.

A claimant's "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996); *see McGeorge v. Barnhart*, 321 F.3d 766, 768 (8th Cir. 2011) (defining RFC as "what the claimant is able to do despite limitations caused by all of the claimant's impairments" (quotation omitted)). "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8P, 1996 WL 374184, at *1. "[A] claimant's RFC [is determined] based on all of the relevant evidence, including the medical records,

observations of treating physicians and others, and an individual's own description of her

limitations." *McGeorge*, 321 F.3d at 768 (8th Cir. 2011) (quotation omitted).

### 1. Plaintiff's Physical RFC

Plaintiff argues that the record lacks substantial evidence to support the ALJ's

conclusion that Plaintiff's RFC allows him to perform a modified range of light work.

Plaintiff asserts that the record is "replete" with evidence of his "severe lumbar spine

impairments"; consultative examiner Dr. Adam concluded that he was disabled on

account of low back pain and that his condition was exacerbated by standing; and there is

no evidence contradicting the ten-pound lifting restriction placed on Plaintiff in 1978

after his back surgery. (Pl.'s Mem. in Supp. of Summ. J. at 9-10.) Plaintiff argues that

"someone who could not tolerate prolonged standing would be unable to perform [six]

hours of standing in an [eight]-hour day as required by the light RFC found by the ALJ."

(Pl.'s Mem. in Supp. of Summ. J. at 10.)

The Commissioner contends that substantial evidence supports a modified light-

work RFC, asserting that treatment records from the late 1970s and early 1990s are not

relevant to Plaintiff's current application and the ALJ properly considered evidence from

all relevant sources of record. (Def.'s Mem. in Supp. of Summ. J. at 9-12.)

The ALJ concluded that Plaintiff could perform modified light work. (*See* Tr. at

18, 24.) Under the regulations, light work is defined as work which

> involves lifting no more than 20 pounds at a time with
> frequent lifting or carrying of objects weighing up to 10
> pounds. Even though the weight lifted may be very little, a
> job is in this category when it requires a good deal of walking
> or standing, or when it involves sitting most of the time with

some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

Much of Plaintiff's argument relies on records from 1978, 1993, and 1994. (*See* Pl.'s Mem. in Supp. Summ. J. at 9-10.) As the Commissioner points out, Plaintiff has not shown how these records, which predate the alleged onset date by 9 to 25 years, are relevant to a determination of Plaintiff's current condition. *See* 20 C.F.R. § 1512(d) (requiring the Commissioner to "develop [a] complete medical history for at least the 12 months preceding the month in which [the claimant] file[s his] application unless there is a reason to believe that development of an earlier period is necessary").

Plaintiff is correct that Dr. Adam described Plaintiff as "disabled because of persistent low back pain." (Tr. at 310; *see* Pl.'s Mem. in Supp. of Summ. J. at 10.) *But see* 20 C.F.R. § 1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that you are disabled.").   But while Dr. Adam stated that prolonged standing and repetitive lifting and bending could be difficult for Plaintiff, he also opined that Plaintiff "could sit with regularly scheduled breaks." (Tr. at 311.) Dr. Adam goes on to state that Plaintiff "is cognitively intact and could answer the telephone, deal with clients and use office machinery.  His hands are dexterous enough to perform tasks requiring fine motor control." (Tr. at 311.)

The ALJ placed significant weight on the opinion of Dr. Eames. (Tr. at 10.) Dr. Eames is a nonexamining source. "When evaluating a nonexamining source's opinion, the ALJ evaluates the degree to which these opinions consider all of the pertinent evidence in the claim, including opinions of treating and other examining sources." *Wildman*, 596 F.3d at 967. Dr. Eames's opinion was based on her review of Plaintiff's records, which included multiple statements by Plaintiff that he was able to either ignore his back pain or control it with medication, as well as the examination conducted by Dr. Adam. (*See* Tr. at 347.) Dr. Eames focused on Dr. Adam's observations that Plaintiff's extremities were strong and well-coordinated, tone was normal, and reflexes were brisk and symmetric. (*Compare* Tr. at 347 *with* Tr. at 310.) Dr. Eames noted Dr. Adam's conclusion that Plaintiff's lumbar flexion and extension are only moderately limited and Plaintiff's shoulder, elbow, wrist, hip and knee joints were normal although straight-leg raising produced pain behind the left knee.

Dr. Adam did not place any specific limitations on Plaintiff's ability to sit, stand, walk, or carry. No other treatment provider or examiner placed greater restrictions on Plaintiff during the relevant period that are inconsistent with the ALJ's modified light-work RFC determination. Therefore, this Court concludes that there is substantial evidence in the record to support the ALJ's finding that Plaintiff could perform modified light work.

### 2. Plaintiff's Mental RFC

Finally, Plaintiff argues that "[t]here remains absolutely no evidence in the record that [Plaintiff] would be capable of working any full-time employment given his

psychological and mental impairments together with overriding fatigue," (Pl.'s Mem. in Supp. of Summ. J. at 15), and he is not capable of employment on a regular and continuing basis, (see Pl.'s Mem. in Supp. at 16). Both of these arguments relate to Plaintiff's RFC, i.e., Plaintiff's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4). Accordingly, the Court analyzes them together.

"The issue is not whether [a claimant's impairment] is fatiguing, it is whether his fatigue is disabling." *Blakeman v. Astrue*, 509 F.3d 878, 882 (8th Cir. 2007). "[W]hether there is a 'need' to lie down is a medical question that requires medical evidence." *Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004). Plaintiff testified that his liver cirrhosis causes him to feel fatigued. (Tr. at 51.) Plaintiff reported to Dr. Mueller that he has low energy and difficulty sleeping. (Tr. at 280.) Walker testified that Plaintiff often took naps. (Tr. at 57.) But the question is not whether Plaintiff's self-reporting is accurate or whether Walker has in fact observed Plaintiff napping during the day; the question is whether Plaintiff's depression compels him to take naps. *See Blakeman*, 509 F.3d at 882 ("The issue is not whether [the claimant] was credible in testifying that he naps each weekday afternoon he is not working. The issue is whether his heart condition *compels* him to nap each afternoon.").

The ALJ found that Plaintiff had mild restrictions in his daily activities, experienced mild difficulty with social functioning, and moderate difficulty maintaining concentration, pace, and persistence. (Tr. at 21-22.) In determining Plaintiff's RFC, the ALJ placed significant weight on the opinions of Drs. Karayusuf and Unversaw. Both

Drs. Karayusuf and Unversaw determined that Plaintiff could understand, retain, and follow simple instructions (*compare* Tr. at 322 *with* Tr. at 324-26) as well as respond appropriately to brief, superficial contact with others (*compare* Tr. at 322 *with* Tr. at 326). Within these parameters, each doctor found that Plaintiff would be able to maintain pace and persistence. (*See* Tr. at 322, 326.) Further, Dr. Unversaw concluded that Plaintiff was only moderately limited in his ability "to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. at 325.) There is no medical evidence in the record that Plaintiff is any more than moderately limited in his ability to maintain pace and persistence or that Plaintiff's major depressive disorder requires him to nap every day.

Therefore, the Court concludes that there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff could perform a limited range of light work on a regular and continuing basis.

[Continued on next page.]

## V. Recommendation

Based upon the record and memoranda and for the reasons stated herein, **IT IS**

**HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment (Docket No. 9) be **GRANTED IN PART** and this matter **REMANDED** for further consideration; and

2. Defendant Commissioner's Motion for Summary Judgment (Docket No. 17) be **DENIED**.


Date: August___16___, 2012                    _____*s/ Tony N. Leung*_____
                                              Tony N. Leung
                                              United States Magistrate Judge
                                              for the District of Minnesota


                                              *Barber v. Astrue*
                                              File No. 11-cv-1221 (JRT/TNL)


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **August 31, 2012**.